Argued and submitted April 7, affirmed November 16, 1982

In the Matter of the Compensation of
the Beneficiaries of Marian A. Williams,
Deceased.

HEWITT,
*Respondent on Review,*

*v.*

STATE ACCIDENT INSURANCE FUND
CORPORATION,
*Petitioner on Review.*

(CA 19548, SC 28252)

653 P2d 970

Darrell E. Bewley, Salem, Appellate Counsel for State Accident Insurance Fund, argued the cause and filed the petition and supplemental brief for petitioner on review. With him on the brief were K.R. Maloney, General Counsel, and James A. Blevins, Chief Trial Counsel, State Accident Insurance Fund, Salem.

Eric R. Friedman, Portland, argued the cause for respondent on review. With him on the briefs was Fellow, McCarthy, Zikes & Kayser, P.C., Portland.

Margaret H. Leek Leiberan and Mitchell, Lang & Smith, Portland, filed a brief Amicus Curiae on behalf of the American Civil Liberties Union.

Cynthia L. Barrett, Portland, filed a brief Amicus Curiae on behalf of the Oregon Trial Lawyers Association.

ROBERTS, J.

Peterson, J. concurred in part and dissented in part and filed an opinion in which Campbell, J. joins.

**ROBERTS, J.**

We are asked in this case to determine the constitutionality of ORS 656.226, a portion of the Oregon workers' compensation laws which provides:

"In case an unmarried man and an unmarried woman have cohabited in this state as husband and wife for over one year prior to the date of an accidental injury received by such man, and children are living as a result of that relation, the woman and the children are entitled to compensation under ORS 656.001 to 656.794 the same as if the man and woman had been legally married."

Claimant in this case, Floyd Hewitt, Jr., cohabited in Oregon with Marian A. Williams, a female, from 1974 until Williams's death as a result of a compensable industrial accident in 1979. When a child was born to the couple in 1976, claimant and Williams executed a joint declaration of paternity naming claimant as father. Following Williams's death, claimant filed a claim for compensation under ORS 656.226, claiming benefits for himself. The referee and Worker's Compensation Board denied his claim, both stating they were without jurisdiction to reach the constitutional issue.[1] The Court of Appeals reversed and ordered that benefits be paid to claimant as if ORS 656.226 were written in gender neutral terms.

ORS 656.226 is not unusual in its attempt to classify recipients of workers' compensation benefits on the basis of gender. Though not cited by the parties, we have discovered cases from seven other states holding unconstitutional workers' compensation statutes which granted automatic death benefits to widows, but allowed such benefits to widowers only upon a showing of dependency. *See Arp v. Workers' Compensation Appeal Board.*, 19 Cal 3d 395, 138 Cal Rptr 293, 563 P2d 849 (1977); *Insurance Company of North America v. Russell,* 246 Ga 269, 271 SE 2d 178 (1980); *Day v. W.A. Foote Memorial Hospital, Inc.,* 412 Mich 698, 316 NW 2d 712 (1982); *Tomarchio v. Township of Greenwich,* 75 NJ 62, 379 A2d 848 (1977); *Passante v. Walden Printing Company,* 385 NYS2d 178, 53 AD2d 8

---

[1] It appears from the record that SAIF paid $1,000 funeral expenses and has paid, on behalf of claimant's and decedent's child, benefits of $100 per month.

(1976); *Davis v. Aetna Life & Cas. Co.,* 603 SW2d 718 (Tenn 1980). *Swafford v. Tyson Foods, Inc.,* 2 Ark App 343, 621 SW2d 862 (1981). In all of these cases the courts found the statutes at issue violative of the equal protection clause of the fourteenth amendment to the United States Constitution.[2] In so doing, the courts commonly relied on the cases of *Wengler v. Druggists Mutual Insurance Company,* 446 US 142, 100 S Ct 1540, 64 LEd 2d 107 (1980) and *Weinberger v. Wiesenfeld,* 420 US 636, 95 S Ct 1225, 43 LEd 2d 514 (1975). *Wiesenfeld* formed the basis of the Court of Appeals opinion in the present case as well, that court finding "no meaningful distinction between *[Wiesenfeld]* and the case at hand." 54 Or App 398, 403, 635 P2d 384 (1981).

Claimant challenges the constitutionality of ORS 656.226 under the fourteenth amendment to the United States Constitution and article I, section 20 of the Oregon Constitution. Article I, section 20, states:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not belong to all citizens."

The fourteenth amendment to the United States Constitution states, in pertinent part:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

This court's forays into the field of alleged gender discrimination have been neither frequent nor recent.[3] This court first considered the issue of gender discrimination in the case of *State v. Baker,* 50 Or 381, 92 P 1076 (1907). *Baker* was a criminal prosecution against the proprietors of a saloon for allowing a woman under the age of 21 to

---

[2] Only the California Supreme Court, in *Arp v. Workers' Compensation Appeal Board,* 19 Cal 3d 395, 138 Cal Rptr 293, 563 P2d 849 (1977), based its holding on state constitutional grounds as well.

[3] Nor has the Court of Appeals had much opportunity in this area. *See State v. Hodgdon,* 31 Or App 791, 571 P2d 557 (1977); *State v. Goddard,* 5 Or App 454, 485 P2d 650 (1971); *State v. Bearcub,* 1 Or App 579, 465 P2d 252 (1970).

remain in or about their saloon. Defendants contended that because the law permitted males over the age of 18 to enter and remain in a saloon, but denied that right to women between the ages of 18 and 21, it was invalid. *Baker* illustrates two points. First, it recognized that men and women constitute "classes" within the meaning of article I, section 20. Second, it shows the view of its era that the "general welfare and good morals" might be pursued by regulating the personal conduct of one of these classes, women, for no better reason than to match that individual conduct to the stereotype imposed upon their sex. The court observed, "By nature citizens are divided into the two great classes of men and women, and the recognition of this classification by laws having for their object the promoting of the general welfare and good morals, does not constitute an unjust discrimination." 50 Or at 385-86. Other language from the opinion states: "The liberties or rights of every citizen are subject to such limitations in their enjoyment as will prevent them from being dangerous or harmful to the body politic * * *." 50 Or at 385. *Baker* is an early example of a "balancing" test approach to "class legislation."

It was not until 1956 that this court again considered the validity of legislation which effects unequal treatment of men and women. In *State v. Hunter,* 208 Or 282, 300 P2d 455 (1956) we upheld the constitutionality of a statute which prohibited females from participating in wrestling exhibitions or competitions. We restated *State v. Baker* to the effect that nature divides citizens "into the two great classes of men and women," and elaborated:

"We take judicial notice of the physical differences between men and women. These differences have been recognized in many legislative acts, particularly in the field of labor and industry, and most of such acts have been upheld as a proper exercise of the police power in the interests of the public health, safety, morals, and welfare * * *. Moreover, there is no inherent right to engage in public exhibitions of boxing and wrestling. Both sports have long been licensed and regulated by penal statute and, in some cases, absolutely prohibited. It is axiomatic that the Fourteenth Amendment to the U.S. Constitution does not protect those liberties which civilized states regard as properly subject to regulation by penal law. Neither does Art 1, § 20, of the Oregon Constitution." 208 Or at 286-87.

In *Hunter* this court found that the legislative classification denying women the right to participate in public wrestling events was based upon a reasonable distinction having a fair and substantial relation to the object of the legislation. Surely no judge today, however, would attempt to justify a statute in the language used by this court then to hypothesize the statutory objective in *Hunter:*

"In addition to the protection of the public health, morals, safety, and welfare, what other considerations might have entered the legislative mind in enacting the statute in question? We believe that we are justified in taking judicial notice of the fact that the membership of the legislative assembly which enacted this statute was predominately masculine. The fact is important in determining what the legislature might have had in mind with respect to this particular statute, in addition to its concern for the public weal. It seems to us that its purpose, although somewhat selfish in nature, stands out in the statute like a sore thumb. Obviously it intended that there should be at least one island on the sea of life reserved for man that would be impregnable to the assault of woman. It had watched her emerge from long tresses and demure ways to bobbed hair and almost complete sophistication; from a creature needing and depending upon the protection and chivalry of man to one asserting complete independence. She had already invaded practically every activity formerly considered suitable and appropriate for men only. In the field of sports she had taken up, among other games, baseball, basketball, golf, bowling, hockey, long distance swimming, and racing, in all of which she had become more or less proficient, and in some had excelled. In the business and industrial fields as an employe or as an executive, in the professions, in politics, as well as in almost every other line of human endeavor, she had matched her wits and prowess with those of mere man, and, we are frank to concede, in many instances had outdone him. In these circumstances, is it any wonder that the legislative assembly took advantage of the police power of the state in its decision to halt this ever-increasing feminine encroachment upon what for ages had been considered strictly as manly arts and privileges? Was the Act an unjust and unconstitutional discrimination against woman? Have her civil or political rights been unconstitutionally denied her? Under the circumstances, we think not." 208 Or at 287-88.[4]

The United States Supreme Court historically has also upheld the constitutionality of gender specific laws.[5] Its willingness to overturn them is a very recent development. That development began with *Reed v. Reed,* 404 US 71, 92 S Ct 251, 30 LEd 2d 225 (1971), in which a unanimous court held a statutory preference for male estate administrators unconstitutional because it provided "dissimilar treatment for men and women who are * * * similarly situated." 404 US at 77. The court framed the issue as "whether a difference in the sex of competing applicants (as estate administrator) * * * bears a rational relationship to a state objective that is sought to be advanced * * *." 404 US at 76. The court held the state's objective, administrative convenience, insufficient to justify the classification.

In *Frontiero v. Richardson,* 411 US 677, 93 S Ct 1764, 36 LEd 2d 583 (1973), a female military officer challenged a requirement that she demonstrate that her spouse was dependent upon her for at least fifty percent of his maintenance in order to receive dependents' benefits. Male personnel received the benefits without such a showing on the part of female dependents. Four of the justices found gender, like race, to be a "suspect" classification bearing a heavy burden of justification. Justice Stewart found "invidious discrimination" on the basis of *Reed.* The three justices who joined Justice Powell in concurring on the basis of *Reed* specifically stated they would not add gender to the list of suspect categories.

---

[4] In two other Oregon cases, *State v. Muller,* 48 Or 252, 85 P 855 (1906) *aff'd* 208 US 412, 28 S Ct 324, 52 LEd 551 (1908) and *Stettler v. O'Hara,* 69 Or 519, 139 P 743 (1914) *aff'd* 243 US 629, 37 S Ct 475, 61 LEd 937 (1916), this court addressed itself to the treatment of women in employment. Those cases involved challenges to laws which discriminated either on the basis of type of business, *Muller,* or location of business, *Stettler.* Neither involved gender discrimination. Both cases were resolved pursuant to the "liberty of contract" versus "police power" analysis of that period.

[5] *See Bradwell v. Illinois,* 83 US (16 Wall.) 130 (1872), (prohibiting married women from practicing law); *Minor v. Happersett,* 88 US (21 Wall.) 162 (1874), (granting only men the right to vote); *Goesaert v. Cleary,* 335 US 464, 69 S Ct 198, 93 LEd 163 (1948) *overruled* 429 US 190, 210, 97 S Ct 451, 50 LEd 2d 397 (1976) (forbidding women to work as bartenders); and *Hoyt v. Florida,* 368 US 57, 82 S Ct 159, 7 LEd 2d 118 (1961), (exempting women from jury duty).

*Weinberger v. Wiesenfeld, supra,* relied upon by the Oregon Court of Appeals in this case, invalidated a provision of the Social Security Act which made the widow and children of a deceased husband automatic beneficiaries but excluded a widower as a deceased wife's beneficiary. The court found that the purpose of the statute was to allow children deprived of one parent the attention of the other parent. Given this purpose, the court held the gender based classification "entirely irrational." 420 US at 651. It concluded "[i]t is no less important for a child to be cared for by its sole surviving parent when that parent is male rather than female." 420 US at 652.

*Wengler v. Druggists Mutual Insurance Company, supra,* invalidated a statute similar to the one at issue in this case. There the husband claimed workers' compensation benefits for the death of his wife in a work-related accident. The law required Wengler, because he was a man, to demonstrate his dependency in order to be eligible for compensation. This he was unable to do. In deciding the case the court refers to a "heightened scrutiny under the Equal Protection Clause." 446 US at 152.

The Supreme Court when faced with gender discrimination challenges imposes what has come to be known as an "intermediate tier" scrutiny somewhere between a "rational basis" equal protection test and a "strict scrutiny" test. Emden, *Intermediate Tier Analysis of Sex Discrimination Cases: Legal Perpetuation of Traditional Myths,* 43 Alb L Rev 73, 1978-1979; Gunther, *The Supreme Court 1971 Term — Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv L Rev 1, 34 (1972-1973). The apparent inconsistency of results[6] under the court's "heightened" but not "strict"

---

[6] *Compare Frontiero v. Richardson, supra,* (striking down a requirement that female but not male military personnel demonstrate spouse's dependency in order to receive dependent's benefits) *with Personnel Administration of Massachusetts v. Feeney,* 442 US 256, 99 S Ct 2282, 60 LEd 2d 870 (1979) (upholding the lifetime preference for veterans in the civil service system); *and Rostker v. Goldberg,* 453 US 57, 101 S Ct 2646, 69 LEd 2d 478 (1981) (validating the Military Selective Service Act which authorized a presidential proclamation requiring men, but not women, to register for the draft). *Compare Cleveland Board of Education v. LaFleur,* 414 US 632, 94 S Ct 791, 39 LEd 2d 52 (1974) (holding that the school board could not require all teachers to stop work after four or five months of pregnancy) *and Geduldig v. Aiello,* 417 US 484, 94 S Ct 2485, 41 LEd 2d 256

scrutiny has sparked criticism for failure to provide a consistent analysis offering guidelines to trial and appellate courts. One early commentator said, "[T]he Court is not certain what constitutes sex discrimination, how virulent this form of discrimination is or how it should be analyzed in terms of due process and equal protection." Johnston, *Sex Discrimination and the Supreme Court — 1971-1974,* 49 NYU L Rev 617, 689 (1974). The kaleidoscope of standards and rationales underlying the United States Supreme Court decisions prompted one judge to write, "* * * the lower courts searching for guidance in the 1970's Supreme Court's sex discrimination precedents have 'an uncomfortable feeling,' like players in a shell game who are not absolutely sure there is a pea." *Vorchheimer v. School District of Philadelphia,* 400 F Supp 326, 340-41 (ED Pa 1975) *rev'd* 532 F2d 880 (3rd Cir 1976) *aff'd by an equally divided court* 430 US 703, 97 S Ct 1671, 51 LEd 2d 750 (1977).

There is no requirement in this case that this court adopt a fourteenth amendment standard for the application of article I, section 20, or that we decide this case on the basis of the federal gender discrimination cases. Claimant here alleges the invalidity of ORS 656.226 under both the federal and state constitutions. It is our duty to determine what the standard should be under our own constitution for statutes that classify on the basis of gender. In doing so, we decline the opportunity to adopt the present standards of the United States Supreme Court's opinions. This court has not considered the validity of a gender specific statute challenged under article I, section 20 of our own constitution in twenty-six years. As a result we are not hampered by recent holdings attempting to whittle away at stereotyped and outmoded notions of "proper" roles for men and women. We are free in Oregon to begin our analysis of

---

(1974) (upholding California's disability insurance system for private employees which excluded from coverage disability due to normal pregnancy). *Compare Craig v. Boren,* 429 US 190, 97 S Ct 451, 50 LEd 2d 397 (1976) (invalidating an Oklahoma statute which forbade the sale of 3.2. beer to males under the age of 21 and females under the age of 18) and *Michael M. v. Superior Court of Sonoma County,* 450 US 464, 101 S Ct 1200, 67 LEd 2d 437 (1981) (declaring valid a California law which makes sexual relationship with a female under the age of 18 a crime while not imposing a like penalty against a female who has a sexual relationship with a male under 18).

gender based laws on a clean slate. There is no violation of claimant's fourteenth amendment rights if those rights are protected under the Oregon Constitution. *Sterling v. Cupp,* 290 Or 611, 614, 625 P2d 123 (1981). It is therefore appropriate to decide this case on the basis of whether ORS 656.226 violates article I, section 20.

■ Article I, section 20, of the Oregon Constitution has been said to be the "antithesis" of the equal protection clause of the fourteenth amendment. *State ex rel Reed v. Schwab,* 287 Or 411, 417, 600 P2d 387 (1979) *cert denied* 444 US 1088, 100 S Ct 1051, 62 LEd 2d 776 (1980); *State v. Savage,* 96 Or 53, 59, 184 P 567, 189 P 427 (1919). While the fourteenth amendment forbids curtailment of rights belonging to a particular group or individual, article I, section 20, prevents the enlargement of rights. *See* Linde, *Without "Due Process,"* 49 Or L Rev 125, 141 (1969-1970). There is an historical basis for this distinction. The Reconstruction Congress, which adopted the fourteenth amendment in 1868, was concerned with discrimination against disfavored groups or individuals, specifically, former slaves. *State v. Bunting,* 71 Or 259, 263, 139 P 731 (1914). When article I, section 20, was adopted as a part of the Oregon Constitution nine years earlier, in 1859, the concern of its drafters was with favoritism and the granting of special privileges for a select few. *State v. Clark,* 291 Or 231, 236, 630 P2d 810, *cert denied* 454 US 1084, 102 S Ct 640, 70 LEd 2d 619 (1981); *School Dist. No. 12 v. Wasco County,* 270 Or 622, 628, 529 P2d 386 (1974).

It is quite clear that the law in question, ORS 656.226, grants an economic privilege to certain women who have cohabited with men and produced a child or children as a result of that cohabitation, while withholding such benefits from men who might request them on the same terms. It grants as well to certain working men the privilege of providing benefits through workers' compensation to keep their family unit intact following accidental death but withholds the same benefit from working women. It discriminates against men in claimant's position who have cohabited with female workers and fathered a child by denying them benefits altogether, and it discriminates against women such as Williams by denying them the privilege of providing through their employment for their

surviving family unit.[7] The privilege created by ORS 656.226 is bestowed or withheld solely on the basis of gender.

We have often said in *dicta* that like the fourteenth amendment, article I, section 20, of the Oregon Constitution prohibits disparate treatment of groups or individuals by virtue of "invidious" social categories. A number of opinions have noted that compliance with article I, section 20 will correspond to compliance with the equal protection clause. *City of Klamath Falls v. Winter, supra; Tharalson v. State Department of Revenue,* 281 Or 9, 573 P2d 298 (1978); *Nilsen v. Davidson Industries, Inc.,* 226 Or 164, 360 P2d 307 (1961); *Plummer v. Donald M. Drake Company,* 212 Or 430, 320 P2d 245 (1958); *Savage v. Martin, supra, State v. Savage, supra.* In *Olsen v. State ex rel Johnson,* 276 Or 9, 554 P2d 139 (1976), this court said of the developing equal protection jurisprudence of the United States Supreme Court: "We do not have any difficulty following that part of the analysis which asks whether the classification is made on the basis of a suspect class such as race or sex and, if so, holding that such a classification is subject to a strict scrutiny." *Olsen,* 276 Or at 19.[8]

This "suspect class" and "strict scrutiny" language has found its way into the law of the various states as well, as courts have been called upon to determine the constitutionality of particular state statutes in the face of state

---

[7] Claimant's supplemental brief before us characterizes the privilege also as "the privilege of the surviving partner * * * to exercise that constitutionally protected right to the companionship, care, custody, and the management of children he or she *[sic]* has sired and raised * * *" citing *Stanley v. Illinois,* 405 US 645, 651, 92 S Ct 1208, 31 LEd 2d 551 (1972). *Stanley* involved a statute by which children of unmarried fathers, upon the death of the mother, were declared wards of the state without any hearing on parental fitness. Without articulating a "fundamental interest" test, the court said that "[t]he private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection." 405 US at 651. We do not pass upon the merits of this argument as applied to the facts of claimant's case, because this issue was not raised at trial or on appeal.

[8] *Olsen* involved an equal protection challenge to the state's system of public school financing. This court examined the United States Supreme Court's analysis in *San Antonio School District v. Rodriquez,* 411 US 1, 93 S Ct 1278, 36 LEd 2d 16 (1973) and ultimately rejected plaintiffs' claim that education was a fundamental right compelling "strict scrutiny." The opinion in *San Antonio* also considered a classification on the basis of wealth, and held such a classification not "suspect." The opinion makes no mention of race or gender.

constitutional challenges. Eighteen state constitutions contain provisions proscribing discrimination on the basis of gender.[9] Many of these states have incorporated the "suspect class" analysis of the federal cases to invalidate gender based legislation under their state constitutions. *Maryland State Board of Barber Examiners v. Kuhn,* 270 Md 496, 312 A2d 216 (1973) (dictum); *People v. Ellis,* 57 Ill 2d 127, 311 NE2d 98 (1974); *Darrin v. Gould,* 85 Wash 2d 859, 540 P2d 882 (1975); *Page v. Welfare Commissioner,* 170 Conn 258, 365 A2d 1118 (1976) (dictum); *Mercer v. Board of Trustees, North Forest Independent School District,* 538 SW2d 201 (Tex Civ App 1976); *Lowell v. Kowalski,* 405 NE2d 135 (Mass 1980); *Hardy v. Stumpf,* 21 Cal 3d 1, 145 Cal Rptr 176, 576 P2d 1342 (1978) (dictum); *Sail'er Inn, Inc. v. Kirby,* 5 Cal 3d 1, 95 Cal Rptr 329, 485 P2d 529 (1971) (decided under the state and federal equal protection clauses).

---

[9] State constitutional provisions proscribing discrimination on the basis of gender and dates of enactment:

Alaska Const. art. I § 3, 1972
California Const. art. I § 8, (enacted in 1879 as art. 20 § 18,
amend in 1970, ren. in 1974)
Colorado Const. art. II § 29, 1972
Connecticut Const. art. I § 20, 1974
Hawaii Const. art. I § 5, 1968, art. I § 21, 1972 (rev. in 1978)
Illinois Const. art. I § 18, 1970
Louisiana Const. art. I § 3, 1974
Maryland Const. Declaration of Rights, art. 46, 1972
Massachusetts Const. pt. 1, art. I, 1976
Montana Const. art. II § 4, 1972 (art. IX § 12, of the 1889
constitution provided for women's suffrage)
New Hampshire Const. pt. 1 art. 2, 1974
New Mexico Const. art. II § 18, 1972
Pennsylvania Const. art. I § 28, 1971
Texas Const. art. I § 3a, 1972
Utah Const. art. IV § 1, 1894
Virginia Const. art. I § 11, 1971
Washington Const. art. XXXI § 1, 1972
Wyoming Const. art. I § 3, 1889

Most of these provisions are similar to the proposed federal Equal Rights Amendment which reads: "Equality of rights under the law shall not be denied or abridged by the United States or any state on account of sex." (Colo., Ill., Md., Mass., N.H., N.M., Pa., Tex., Wash.) Alabama, Connecticut, Hawaii, Montana and Virginia include sex with race, color, national origin, etc. The California provision reads:

■        Oregon has no equal rights provision related specifically to gender, yet we do not feel constrained to limit our application of article I, section 20 on this basis. By its terms article I, section 20 forbids the granting of privileges to "any citizen" or any "class of citizens." The privileges of ORS 656.226 extend to the classes of working men, and women with children by working men. Like other state and federal courts, we agree that a classification is "suspect" when it focuses on "immutable" personal characteristics. It can be suspected of reflecting "invidious" social or political premises, that is to say, prejudice or stereotyped prejudgments. Historically, the most obvious such classification, and the one recognized to be such within the special concerns that gave rise to the fourteenth amendment, was,

---

"§ 8. Business, profession, vocation or employment; sex, race, creed, color, or national or ethic origin

"Sec. 8. A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethic origin."

The Louisiana provision reads:

"§ 3. Right to Individual Dignity

"Section 3. No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime."

The Utah provision appears in Article IV entitled Elections and Right of Suffrage:

"Section I. [Equal political rights.]

"The rights of citizens of the State of Utah to vote and hold office shall not be denied or abridged on account of sex. Both male and female citizens of this State shall enjoy equally all civil, political and religious rights and privileges."

The Wyoming provision states:

"§ 3. Equal political rights.

"Since equality in the enjoyment of natural and civil rights is only made sure through political equality, the laws of this state affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex, or any circumstance or condition whatsoever other than individual incompetency, or unworthiness duly ascertained by a court of competent jurisdiction."

of course, racial discrimination.[10] But when we consider "classification" by collective human characteristics apart from whether the discrimination is adverse, in violation of the equal protection clause, or favorable, as proscribed by article I, section 20, we find that classification of one's personal privileges and immunities by one's gender is at least as old as by race, and as much based on unexamined societal stereotypes and prejudices. Gender is a visible characteristic determined by causes not within the control of the individual. It bears no relation to ability to contribute to or participate in society. The purposeful historical, legal, economic and political unequal treatment of women is well known.[11] Accordingly, we hold that when classifications are made on the basis of gender, they are, like racial,[12] alienage[13] and nationality[14] classifications, inherently suspect. The suspicion may be overcome if the reason for the classification reflects specific biological differences between men and women. It is not overcome when other personal characteristics or social roles are assigned to men or women because of their gender and for no other reason. That is exactly the kind of stereotyping which renders the classification suspect in the first place.

SAIF argues that the statute embodies legislative concern for workers' dependents and its purpose is to provide only for women because women are assumed to be dependent on men more often than the reverse. If we were convinced of this interpretation the issue of the constitutionality of the classification could be speedily resolved. The assumption of female dependency is "an archaic and

---

[10] The notion of suspect classifications was originally formulated in United States Supreme Court cases involving racial discrimination. *See McLaughlin v. Florida,* 379 US 184, 196, 85 S Ct 283, 13 LEd 2d 222 (1965).

[11] Until the passage of the nineteenth amendment to the federal constitution in 1920 women were denied the right to vote. It was not until the passage of the Civil Rights Act of 1957 that women became eligible to serve on federal juries. *See Sail'er Inn, Inc. v. Kirby, supra,* 5 Cal 3d at 19, n. 19, 95 Cal Rprt at 341, 485 P2d at 541. *Kahn v. Shevin,* 416 US 351, 353-54 n. 4 and 5, 94 S Ct 1734, 40 LEd 2d 189 (1974).

[12] *Loving v. Virginia,* 388 US 1, 11, 87 S Ct 1817, 18 LEd 2d 1010 (1967); *Bolling v. Sharpe,* 347 US 497, 499, 74 S Ct 693, 98 LEd 884 (1954).

[13] *Graham v. Richardson,* 403 US 365, 372, 91 S Ct 1848, 29 LEd 2d 534 (1971).

[14] *Oyama v. California,* 332 US 633, 646, 68 S Ct 269, 92 LEd 249 (1948).

overbroad generalization." *Schlesinger v. Ballard,* 419 US 498, 508, 95 S Ct 572, 42 LEd 2d 610 (1975). Such a statutory classification relying on gender as legislative shorthand for dependency is the kind of stereotype that cannot withstand an article I, section 20 challenge. *Cf.,* under the federal constitution, *Schlesinger v. Ballard, supra; Califano v. Goldfarb,* 430 US 199, 217, 97 S Ct 1021, 51 LEd 2d 270 (1977); *Frontiero v. Richardson, supra.*

The Court of Appeals found it apparent from the statute that its purpose was to give assistance to the surviving members of the family, not to women as a disadvantaged group, *supra,* 54 Or App at 402. ORS 656.226 was originally enacted in 1927 and has continued in force with little change. No legislative history of ORS 656.226 exists to clarify its original purpose and we are reluctant to surmise.

In 1973, ORS 656.226 was the subject of discussion during proffered amendments to the workers' compensation statutes. Senator Burbidge proposed Senate Bill 46 to equalize gender specific language throughout Chapter 656. In introducing the package to the Senate Labor Committee on February 8, 1973, Senator Burbidge indicated that the amendments were prepared to remedy serious inequities in benefits in keeping with the cost of living, adding "there are as many working women as men." Minutes, Senate Labor Committee, February 8, 1973, at 3. A statement of that date drafted by Robert Babcock, a Portland attorney, states that the effect of the amendments is to "erase the only remaining distinctions of treatment under the Oregon Workmen's *[sic]* Compensation Act which are based on the sex of the workman *[sic]* or the beneficiary." Minutes, Senate Labor Committee, February 8, 1973, Exhibit B, at 1. That exhibit specifically addresses ORS 656.226. It notes that one purpose of the workers' compensation laws is to reduce litigation. The exhibit explains that without the amendments the "common law husband" receives no benefits under the act; he nonetheless retains his potential right of action for death or injury of his partner. The amendment would serve to avoid this frustration of the purpose of the act.

The section of the bill amending ORS 656.226 to incorporate gender neutral language remained in effect

throughout Senate amendments but the House Committee on Labor and Industrial Relations, at Representative Wilhelms's initiative, struck the gender neutral language of ORS 656.226. Wilhelms commented that he desired to withhold ORS 656.226 benefits from "an able-bodied man who was cohabiting with a woman worker who was injured or killed." House Labor and Industrial Relations Committee, May 21, 1973. Before the vote there was considerable discussion that if the gender neutral language were eliminated the law would continue as it was and children would receive benefits. It was emphasized twice that the major concern was for the children. *Id.* On June 15, 1973, Mr. Kulongoski (not a legislator at that time) explained to the committee the need for the Senate language in order to avoid discrimination. Representative Elliott, a committee member, was of the opinion that there would be a legal problem with discrimination against the woman worker and moved to restore the gender neutral language. One committee member expressed concern that without the amendment "what you're doing here in effect is recognizing a common law marriage for one and not the other." House Labor and Industrial Relations Committee, June 15, 1973. Another committee member indicated that the statute sought to provide benefits not to women but to the "survivor whoever that may be." *Id.* Representative Elliott's motion to restore carried. Representatives Wilhelms and Patterson arrived after the vote and voted against and successfully prevented moving the bill to the floor with a do pass recommendation.

Discussion of the constitutionality of the statute ensued. When faced with a suggestion by one committee member that judicial invalidation of the statute could follow a successful constitutional attack, another committee member responded that they did not want "the attorney general or the court to throw it out." *Id.* There was general agreement among committee members in support of this sentiment. In an apparent attempt to resolve the impasse created by Representative Wilhelms's dissatisfaction with the Senate amendment one committee member suggested they delete the entire section. This idea gained no support. The discussion once again indicates the committee's concern that benefits be available to children. *Id.* No

resolution of the issue was reached at this meeting. On June 18, 1973, Representative Wilhelms again moved to delete the gender neutral language. The motion carried without discussion and the amended bill passed to the floor. While the Committee's reasons for the ultimate rejection of gender neutral amendments to ORS 656.226 are open to conjecture,[15] its perception of the purpose of ORS 656.226 is clear. The committee recognized the statute as one designed primarily to ensure entitlement to benefits for the worker's family unit, not the adult partner alone. A concern with the welfare of workers' children dominated the debates. The Committee was aware that throughout the workers compensation statutes, illegitimate as well as legitimate children enjoy equal entitlement to benefits. ORS 656.005(6). Significantly, the Committee rejected a proposal that ORS 656.226 be deleted in its entirety, desiring instead to ensure that eligible children receive the additional benefits available to the family through application of ORS 656.226.

That the statute was designed to benefit the family unit is apparent from the eligibility requirements of the statute itself. Without a child of the relationship living with the family a cohabitor is ineligible. *Thomas v. SAIF,* 8 Or App 414, 495 P2d 46 (1972). Without an entitled parent, *i.e.,* cohabitation for over one year prior to injury, a child cannot benefit. A family must exist before entitlements ensue.[16]

■ It is apparent that the gender classification of ORS 656.226 is not based on intrinsic differences between the sexes. Rather, it reflects assumptions about the relative social roles and the probable dependency of men and women. Families of deceased male workers may receive

---

[15] Petitioner relies on Representative Wilhelms's comment expressing his desire to withhold ORS 656.226 benefits from able-bodied men. In light of subsequent committee discussion it is very doubtful that Rep. Wilhelms was expressing more than a personal opinion.

[16] We note that petitioner's earlier interpretation of the purpose of ORS 656.226 in *Kempf v. SAIF,* 34 Or App 877, 580 P2d 1032 (1978), corresponds with our own. In *Kempf* SAIF argued that the purpose of the statute was not to provide compensation to surviving partners in their own right, but to protect children by insuring that the surviving parent who has responsibility for such children is not left destitute. 34 Or App at 883 n. 1 (Joseph, J. dissenting).

benefits regardless of marital status of the mother while families of deceased female workers may receive benefits only if the parents were married. Accordingly we find the statute unconstitutional.

■ We turn now to the issue of the appropriate remedy. Respondent urges invalidation of the entire statute arguing that whenever a statute is found unconstitutional its invalidation is the only remedy; claimant desires extension of benefits to himself and all classes unconstitutionally excluded.

Cases from other jurisdictions have remedied unconstitutional provisions in workers' compensation laws with a variety of results. Thus *Arp v. Workers' Compensation Appeal Board, supra,* invalidated a statutory presumption of female dependency and held extension of benefits to be inappropriate without a reasonably clear expression of legislative intent. The court was careful to demonstrate that the family unit would not suffer as a result of its decision. Both parents remained eligible if they could demonstrate dependency; and the children would now receive the full death benefit that was originally awarded to the widow. *Day v. W.A. Foote Memorial Hospital, Inc., supra,* invalidated a similar statutory presumption of dependency for widows. The court found extension inappropriate in light of a deliberate legislative decision to exclude widowers. *Swafford v. Tyson Foods, Inc., supra,* struck a similar statutory presumption and extended benefits. The court indicated that legislative abolition of the gender distinction after the case was filed demonstrated an intent to provide compensation to all survivors equally. *Tomarchio v. Township of Greenwich, supra,* extended a similar dependency presumption to widowers. The court was persuaded that in light of legislative revisions to the workers' compensation laws subsequent to the filing of the case extension was the remedy least destructive of the dominant plan to provide dependency benefits. *Davis v. Aetna Life & Cas. Co., supra,* extended a similar dependency presumption to men. Legislative revisions since the case arose indicated to the court an intent to provide equal treatment. *Passante v. Walden Printing Company, supra,* extended the statutory presumption of dependency to widowers without discussion. In *Insurance Company of North America v. Russell, supra,* a

similar presumption was both eliminated for women and rewritten for men. After the court's decision, survivors of both gender could recover upon proof of dependency. Widowers were no longer required to prove, in addition to dependency, incapacity to support themselves. In *Fenske v. Public Employees Retirement System Board of Administration,* 103 Cal App 3d 590, 163 Cal Rptr 182 (1980), the California Court of Appeals reviewed the *Arp* remedy. *Fenske* addressed the constitutionality of an entitlement available only to men which allowed an employee to elect a job classification which resulted in an increased retirement pension if the employee became disabled. Rather than invalidate the regulation after finding it unconstitutional, the court extended the entitlement to the female plaintiff indicating that "[t]his is the very type of situation in which *Arp* would extend the benefits rather than invalidate the statute." (Footnote omitted.) 103 Cal App 3d at 598, 163 Cal Rptr at 187. Of significance to the court was the fact that invalidation would result in an absolute denial of benefits to both males and females, unlike the situation in *Arp,* and in contradiction of legislative intent. *Fenske,* while not involving a workers' compensation statute, is most closely analogous to the situation in the present case. Invalidation of ORS 656.226 will result in total elimination of statutory benefits for all recipients. In the above cited workers' compensation cases benefits remained available even where the statute was invalidated so long as an applicant could demonstrate actual dependency.

Our sister states' decisions are illustrative for a number of reasons. First, they demonstrate there is no universal rule compelling invalidation of constitutionally defective statutes. Second, contrary to the dissent's view that we should not extend the statute, these opinions affirm that courts are not without power to repair such statutes in appropriate circumstances. Finally, they provide an analytical framework by which the appropriate remedy may be assessed: we first examine the legislative purpose in providing benefits under the challenged statute; we then resolve what the legislature would have done if faced with the invalid statute. Would it terminate coverage to all recipients or extend benefits to those improperly excluded? We find equally strong support for the proposition that

courts are empowered to extend underinclusive statutes from the United States Supreme Court. Justice Harlan concurring in *Welsh v. United States,* 398 US 333, 361, 90 S Ct 1792, 26 LEd 2d 308 (1970) stated:

"Where a statute is defective because of underinclusion there exist two remedial alternatives: a court may either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion."

*Wiesenfeld, supra,* examined the legislative purpose in providing Social Security benefits to widows and found extension of benefits to widowers the alternative least disruptive of that purpose.

In *Wengler, supra,* the United States Supreme Court remanded the case to the Missouri Supreme Court for the specific purpose of addressing the issue of extension or invalidation. The court stated:

"We are left with the question whether the defect should be cured by extending the presumption of dependence to widowers or by eliminating it for widows. Because state legislation is at issue, and because a remedial outcome consonant with the state legislature's overall purpose is preferable, we believe that state judges are better positioned to choose an appropriate method of remedying the constitutional violation." 446 US at 152-53.

As we have seen, the purpose of ORS 656.226 is to provide benefits to families of workers injured or killed on the job. Except for his gender, claimant and his family in this case fulfill the statutory requirements for entitlement. In resolving how the legislature would have remedied the invalidation of the statute we need not hypothesize. We have seen that when faced with the issue of the statute's discriminatory impact on women workers the committee was in general agreement that they did not want the statute "thrown out." When presented with the suggestion that they delete the statute entirely committee members thought it more important to ensure benefits to the family unit. Thus, given the choice between eliminating the statute entirely or passing it out of committee in potentially unconstitutional form, they chose to preserve existing entitlements to male workers' families. Invalidation here

would deprive all cohabitants of unmarried workers of benefits. This is in clear conflict with legislative intent. We note that one objective of the workers' compensation law is "to provide * * * fair, adequate and reasonable income benefits to injured workers and their dependents." ORS 656.012(2)(a). Extension of benefits in this case advances the purpose of the legislation and comports with the overall statutory scheme.[17]

This court has never addressed the issue of remedy in a case like the present. Our analysis appropriately includes consideration of the remedial alternative of extension of benefits to the excluded class. This is so because even though the classification is unconstitutional the underlying purpose of the statute remains valid. Where, as here, the statutory classification is underinclusive, the court must examine legislative history to assess how best to maintain the objective sought to be achieved by the statute. In addition, we are reluctant to adopt a policy of *per se* invalidation of statutes containing discriminatory classifications. Such a policy provides a disincentive for litigants to challenge objectionable statutes. More importantly, we are not convinced that denial of benefits to all adequately and fairly resolves the problem of discriminatory laws. We see no reason why in this case, for example, the entitlements of female cohabitants and their families should be eliminated so that the rights of male cohabitants and their families may be vindicated.[18]

---

[17] We do not read *Pavlicek v. SIAC,* 235 Or 490, 385 P2d 159 (1963) to compel invalidation whenever a nonseverable statute is held unconstitutional. *Pavlicek* involved a worker's challenge to the constitutionality of the Oregon Occupational Disease Law on the grounds that the statute failed to provide for jury trial or judicial review of the commission's decision. The court rejected the claim because it reasoned that severance, the requested remedy, would not provide the relief sought. 235 Or at 492-93, 495. The court did not reach the constitutional issue but stated in dicta that a finding of unconstitutionality would compel invalidation of the entire statutory scheme. 235 Or at 495. The *Pavlicek* court correctly assumed that no other course was available short of rewriting the procedures available to a litigant at the agency level. The instant case is quite different. It does not concern the adequacy of procedural due process rights afforded by statute but addresses rather the propriety of an underinclusive classification which confers benefits.

[18] The dissent criticizes the majority for "legislating" by extending the statute. It should be pointed out that the dissent's remedy would repeal the entire statute, a result no less "legislating" in effect and contrary to the statute's purpose and the intent expressed in the legislative history described in the text of this opinion. The dissent suggests alternate remedies the legislature may choose were we to

Having resolved that the purpose of ORS 656.226 is to provide benefits to families of injured workers and in light of the legislative reluctance to eliminate the statute when faced nine years ago with the hypothetical facts of the case we are in fact deciding today, we affirm the Court of Appeals decision, recognizing that extension of benefits to claimant most effectively fulfills the purpose of the legislation.

Affirmed.

**PETERSON, J.,** concurring in part; dissenting in part.

I concur in that portion of the majority opinion which holds that ORS 656.226 is invalid because it impermissibly discriminates on gender grounds against men in claimant's position and discriminates against women by denying them the privilege "of providing through their employment for their surviving family unit." 294 Or at 42-43. I dissent, however, from that part of the opinion which extends benefits to the claimant. In my opinion, this court lacks the power to legislatively repair the constitutional infirmity of ORS 656.226.

The vexing problem in this case is whether, because ORS 656.226 is unconstitutional, we should remedy the constitutional imperfection by extending the benefits to the underincluded class, represented in this case by the plaintiff. Cases such as this raise particularly difficult questions of extension versus invalidation because if the statute is merely invalidated without extension, the claimant does not obtain benefits (even though he prevailed in having the statute declared unconstitutional) *and* the spectre arises that those needy persons now receiving benefits will also lose them if extension is not granted. Therefore, as many of the cases cited in the majority opinion demonstrate, many courts grant extension without consideration or discussion of the vexing separation of powers question implicit in the extension-invalidation controversy.

---

invalidate the statute. Those remedies are no less available to the legislature by the extension of the statute to the excluded males should it decide to amend the law.

*See generally,* Note, *Extension versus Invalidation of Under-inclusive Statutes: A Remedial Alternative,* 12 Colum J L & Soc Probs 115 (1975).

In 1973, Senate Bill 46 proposed to amend ORS 656.226 to read:

> (Bracketed words represent deleted language; italicized words are new language):

> "656.226 In case an unmarried man and an unmarried woman have cohabited in this state as husband and wife for over one year prior to the date of an accidental injury received by [such man] *one of them,* and children are living as a result of that relation, the [woman] *other* and the children are entitled to compensation under ORS 656.001 to 656.794 the same as if the man and woman had been legally married."

The amendment was rejected. One irrebutable conclusion can be drawn from the 1973 history: The legislature then intended that ORS 656.226 should not be amended to extend benefits to cohabiting males on the same terms as cohabiting females. This court has, by judicial legislation, now passed the very measure which the legislature rejected in 1973.

Legislatures pass laws. Courts interpret laws. Had it known that ORS 656.226 would be held invalid, the legislature may well have enacted the statute proposed in SB 46. But I do not know that, and neither does any other member of this court. Why, then, does the majority judicially amend the statute in the very manner the legislature rejected in 1973? Apparently because of its perception of what the legislature would have done had it known that we would invalidate the statute.

The solution enacted by the majority is only one of several actions the legislature might take after this law is nullified. There are other possible solutions to the problem, each solution having significant fiscal and sociological consequences. If we do nothing but discharge our constitutionally-appointed task and nullify the offending statute, the legislature, when it convenes in January, 1983, will undoubtedly consider the problem. It might consider these solutions in responding to our decision invalidating ORS 656.226:

1.  Do nothing.

2.  Extend the benefits of ORS 656.226 consistent with this court's judicial extension of coverage by amendment along the lines proposed in 1973.

3.  Provide benefits to male and female cohabitants alike, but only if the injured person was a family's principal wage earner.

4.  Provide benefits to male and female cohabitants alike if proof of dependency is shown.

5.  Decide upon a solution incorporating some of the features of 2, 3, and 4 above.

The legislature could also provide for continued benefits to claimants who were receiving benefits before the date of our decision invalidating ORS 656.226, and whose benefits had been terminated, as well as benefits to claimants whose claims arose between the date of our decision and the date of the amendment.

Legislatures should not look to courts to discharge legislative functions. When legislatures pass laws which may be unconstitutional, expecting the courts to rewrite the law in constitutional terms, courts should not accept the invitation.[1]

True, many courts, when faced with the choice of invalidation of an unconstitutional benefits statute vis-a-vis extension of underinclusive statutes by judicial act have extended benefits to the excluded class. Most of the cases in which judicial extension has occurred involved statutes which already extended benefits to the excluded class, but required a higher showing—a greater degree of proof—to qualify for benefits. One leading case, *Califano v. Goldfarb,* 430 US 199, 97 S Ct 1021, 51 L Ed 2d 270 (1977), typifies such cases. There, widows of deceased workers qualified for survivor's benefits without proof of dependency. Widowers were ineligible unless they proved that they received more than half of their support from their deceased wife. The Supreme Court struck the requirement that male claimants

---

[1] Situations in which legislatures enact legislation using broad language, leaving it to the courts to interpret ambiguous terms, are distinguishable. *See, e.g., DeCicco v. Ober Logging Co.,* 251 Or 576, 579, 447 P2d 297 (1968).

make a greater showing than female claimants in order to qualify and granted extension without discussion of the issue. *Accord: Frontiero v. Richardson,* 411 US 677, 93 S Ct 1764, 36 L Ed 2d 583 (1973), in which the Supreme Court struck a similar provision requiring that spouses of servicewomen prove that she supplied more than half of her husband's support in order for him to receive dependents' benefits in the same manner as a spouse of a serviceman, and applied the statute as if the exception to coverage did not exist. The cases cited on pages 50-51 of the majority opinion fall within that category.[2]

The only recent Supreme Court case discussing the question of extension versus invalidation is *Califano v. Westcott,* 443 US 76, 99 S Ct 2655, 61 L Ed 2d 382 (1979) (AFDC - Unemployed Father program provided welfare benefits to families with young children in which the father was unemployed, but not to families with young children in which the mother was unemployed, held violative of equal protection component of Fifth Amendment due process; extension to families with unemployed mothers held proper remedy). In *Westcott* the Massachusetts Public Welfare Commissioner stipulated that some form of judicial extension should be made. 443 US at 90. The commissioner argued that the least disruptive extension would be to extend benefits to children when the unemployed person was the principal wage earner. This suggestion was rejected, and extension was granted because nullification "* * * would impose hardship on beneficiaries whom Congress plainly meant to protect." 443 US at 90. The court specifically noted that "[s]ince no party has presented the issue of extension versus nullification for review, we would be inclined to consider it only if the power to order extension were clearly beyond the constitutional competence of a federal district court." 443 US at 91. Even so, four justices dissented on the ground that the court was usurping the prerogatives of the legislature. 443 US at 93-96.[3]

---

[2] Moreover, in a number of cases cited by the majority, by the time of the appellate court decision the legislature had already made the change made by the court. In most cases ordering extension, extension was ordered without discussion of the issue whether extension was appropriate and permissible.

[3] In addition to the commissioner's stipulation for extension, there was a compelling practical reason for the *Westcott* extension: all benefits to dependent

There can be no denying that this court is legislating, and I believe that in so doing we violate the separation of powers clause of the Oregon Constitution.[4] It may be that the legislature would enact ORS 656.226 in the very form the majority has. On the other hand, it might not. In addition, the very fact that this court has passed SB 46 may have a future effect upon further legislative consideration of this question.

The effect of this court's opinion is to enact a new law. I have no experience as a legislator, but I suspect that it is sometimes impossible to obtain a majority for any *one* change to a statute even though a majority of the legislators agree that *some* change should be made. Thus, the fact that we nullify and extend may have legislative significance apart from the outcome of this case. If the legislature is unable to agree on a solution, this court's "legislative" solution would remain in force.

The point is not only that courts are forbidden to legislate, we lack the resources to make legislative decisions. Though we may possess judicial ingenuity, we have no knowledge of the fiscal implications of our opinion, and little knowledge of its other implications. We have no idea what the legislature's collective belief is concerning the extension of benefits to able-bodied, nondependent male claimants[5] as compared with some other form of relief to families of injured or deceased unmarried workers who have living children as a result of cohabiting with another person. Were I a legislator, in all probability I would do what the majority has done in extending benefits. But I might

---

children would be limited if extension was not ordered. In the case at bar (contrary to the statement on pages 52-53 of the majority opinion that "[i]nvalidation here would deprive all cohabitants of unmarried workers of benefits"), children of injured workers, male or female, would continue to receive benefits under ORS 656.204(4).

[4] Article III, section 1, of the Oregon Constitution provides:

"The powers of the Government shall be divided into three seperate (sic) departments, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

[5] I should point out that the legislature has not required a showing of dependency for nondependent, able-bodied male spouses to receive benefits. *See, e.g.,* ORS 656.204.

vote for some other solution, were I convinced that there are other policies which suggest a different answer, or other needs which are greater or more immediate, or if my constitutents disfavored the extension of benefits.

The legislature convenes in two months, perhaps earlier. It has the power to avoid almost every adverse effect of invalidation, even those occurring before it convenes. That is its constitutionally-appointed job, and we should let them do it.[6]

The legislature, by virtue of Article III, section 1, of the Oregon Constitution has been determined to be better able to yoke in common harness the diverse temperaments, qualities and needs of our society. Although this is an appealing case for extension, I believe that our deference to the legislative department is compelled, lest the judicial lamb swallow the legislative lion.

Campbell, J., joins in this opinion.

---

[6] Particularly when time is not of the essence.